UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



TED AMLEY,

                      Plaintiff,

     -against-

SUMITOMO MITSUI BANKING
CORPORATION,

                    Defendant.

No. 19 Civ. 3777 (CM) (BCM)

## MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

McMahon, J.:

Plaintiff Ted Amley brings this action against his employer, Sumitomo Mitsui Banking

Corporation ("SMBC") for violations of the Family and Medical Leave Act (FMLA), 29 U.S.C. §

2601 *et seq*,; the New York State Human Rights Law (NYSHRL), Executive Law § 296, *et seq.*,;

and the New York City Human Rights Law (NYCHRL), N.Y.C. Admin. Code § 8-101 *et seq*.

Plaintiff moves for summary judgment on his claim for interference under the FMLA; that motion

is DENIED. Defendant moves for summary judgment on all counts; that motion is GRANTED

IN PART and DENIED IN PART.

### BACKGROUND

**I.     Undisputed Facts**

SMBC is a Japanese baking institution with operations worldwide. (Dkt. 79; Joint 56.1 ¶

1.) Plaintiff, an attorney, joined Sumitomo's PDAD (Planning Division, America's Department)

Legal Department in SMBC's New York branch on August 22, 2011. (*Id.* ¶ 2.) He reported to

William Haney, the General Counsel of SMBC, and later to Hiro Oshima, Managing Director & Joint General Manager.  (*Id.* ¶¶ 3, 4.)

Attorneys like Plaintiff provided legal services to the bank itself and to business people within the bank engaging in transactions with outside third parties or interacting with regulators. (*Id.* ¶ 5.)  Plaintiff was assigned to work primarily on behalf of a particular SMBC business unit in the Securities Products Group ("SPG").  (*Id.* ¶ 27.)  At SMBC, this was referred to as being "embedded" in that business; while Plaintiff was embedded, he remained a member of PDAD Legal.  (*Id.* ¶¶ 28-30.)

On November 1, 2015, Oshima became Plaintiff's direct supervisor.  (Chinn Decl. Ex. 8.)

*A. SMBC's FMLA Policy*

SMBC published and maintained a Handbook that explained how to seek FMLA leave, which was available to all eligible employees.  (Joint 56.1 ¶¶ 8, 10.)  The FMLA policy provided,

> The FMLA entitles eligible employees of covered employers to take unpaid, job-protected leave for specified family and medical reasons with continuation of group health insurance and welfare benefits coverage under the same terms and conditions as if the employee had not taken leave.  Eligible employees are entitled to: Twelve workweeks of leave in a rolling 12-month period.

(*Id.* ¶¶ 9-11.)

The SMBC Handbook also contained a subsection titled "How to Apply," which stated,

> Please contact your HR Representative to arrange a meeting to discuss your leave. At this meeting you will be required to submit a completed Request for FMLA Leave form to your Human Resources Representative and you will be provided with other forms depending on the reason for your FMLA leave. . . .

> You should arrange a meeting . . . at least 15 days [in advance], if practical, for your own serious health condition or that of a spouse, child or parent.  If the specified advance notice is not practical, you should give at least two business days notice, except in extraordinary circumstances.

(*Id.* ¶¶ 12, 13.)

For employees seeking "intermittent or non-consecutive leave," the Handbook provided,

> For this type of leave, you will be required to provide both your manager and your HR representative a schedule of your time out of the office in advance. If this information is not available in advance, then you must provide HR with a report at the end of each month outlining your time away from the office.

(*Id.* ¶¶ 14, 15.)

Amley acknowledged his receipt of this version of the Handbook twice during his employment: on August 22, 2011 and on June 15, 2016. (*Id.* ¶¶ 16, 17.)

On May 1, 2017, SMBC issued an updated handbook ("2017 Handbook"), which Plaintiff received (and acknowledged his receipt of) on May 24, 2017. (*Id.* ¶¶ 22, 25.) The FMLA provisions remained unchanged from the earlier Handbook in significant part, but modified the requirements concerning the timing of the employee's notice:

> You must provide at least 30 days advance notice to HR before FMLA leave is to begin if the need is foreseeable based on an expected birth, placement for adoption or foster care, planned medical treatment for your serious health condition or that of your family member . . . .
>
> If 30 days' notice is not practicable, such as because of a lack of knowledge of approximately when leave will be required to begin, a change in circumstances, or a medical emergency, notice to HR must be given as soon as practicable.

(*Id.* ¶ 23; SMBC004739.) Like the earlier version, the 2017 Handbook specified that employees should contact the HR Benefits team to arrange a meeting to discuss the leave. (*Id.* ¶ 24.)

*B. Amley' Feedback From Supervisors And Clients*

As early as 2012, Haney started receiving comments from clients indicating that they were dissatisfied with Plaintiff's overly rigid approach to risk evaluation. (Chinn Decl. Ex. 15.) Nonetheless, Plaintiff's FY 2012 and FY 2013 reviews were generally positive.

A serious incident with a client marred Plaintiff's performance the next year. On June 30, 2014, a Bank client asked Plaintiff to complete a loan agreement review for a transaction that was

3

supposed to close that evening.  Plaintiff stopped responding to the client at approximately 5:30 PM.  (Chinn Decl. Ex. 16.)  When the client could not reach Plaintiff, he contacted Oshima (who was not at the time Plaintiff's direct supervisor) to ask why Plaintiff "[left] the office without completing th[e] documentation."  (*Id.*)  Oshima took over the communications with the client, and attempted to reach Plaintiff via text message so that the client could finalize the deal.  At 9:40 PM, Plaintiff responded to Oshima, writing, "Either way this is going to wait until tomorrow." (*Id.*)  He did not respond to any additional messages from Oshima or the client until the following morning.

Notwithstanding this incident, Plaintiff received an overall positive FY 2014 review from Haney.  Oshima testified in his deposition that he asked Haney if he could fire Plaintiff the following day (Oshima Tr. I at 164:21-165:3), though Haney could not recall whether Oshima asked the question (Haney Tr. at 65:20-66:11).  Plaintiff was not fired.

Feedback from both clients and managers became increasingly negative after Oshima became Plaintiff's direct supervisor on November 1, 2015.  On March 29, 2016, Plaintiff received a review covering the period from April 1, 2015 to March 31, 2016 ("FY 2015 review").  (Chinn Decl. Ex. 19.)  Oshima assigned Plaintiff an "Overall Rating" of "Meets" and evaluated his "Overall Job Competency Assessment" as "Gaps."[1]  (*Id.*)  In the review, he described Plaintiff as having "a reputation of being less than flexible at times" and in need of "a better understanding and a more tactful and service-minded relationship with his clients."  (SMBC4379.)  Oshima also noted that Plaintiff "clashed often with clients in ways that are not conducive to a good working relationship."  (SMBC4382.)  That June, SMBC decreased Plaintiff's discretionary bonus for FY 2015.

---

[1] Beginning in 2016, SMBC evaluated employees on a three-tiered scale: "gaps," "meets," and "exceeds."

4

Oshima continued to receive negative comments about Plaintiff's performance from clients. On October 28, 2016, he conducted a "pulse check," in which he noted that Plaintiff "still needs to improve relationship with colleagues and clients, with an eye toward 'bed side manner.'" (Chinn Decl. Ex. 21.) Over the next few months, Plaintiff continued to clash with clients over email. (Chinn Decl. Exs. 23, 24.)

On March 30, 2017, Plaintiff received a review covering the period from April 1, 2016 to March 31, 2017. Again, Oshima gave Plaintiff several "Gaps" ratings. He noted that "communication and bed side manners [are] still lacking compared to what is expected of attorneys in our department," and that clients "actively seek to have work assigned to other attorneys" because they were "not[] pleased with his communications skills or style." (Chinn Decl. Ex. 56.)

Plaintiff's unresponsiveness, tone, and inability to effectively communicate his legal opinions to clients continued until his eventual termination, which occurred on September 29, 2017. (Chinn Decl. Exs. 57, 58, 59, 61, 64, 65, 67[2], 69, 71, 77, 80.)

### C. Amley's Absences

Plaintiff was diagnosed with plantar fasciitis in August 2016.

While Plaintiff was employed by SMBC, he saw two doctors for plantar fasciitis: Dr. Mei and Dr. Artandi. (Joint 56.1 ¶ 31.) Amley never contacted SMBC's HR department to discuss FMLA leave and never provided the department with any notice seeking FMLA leave for appointments with Dr. Artandi. (Id. ¶¶ 26, 27.) Nonetheless, Plaintiff scheduled several appointments with Dr. Artandi during the workday throughout the fall and winter of 2016. Plaintiff saw Dr. Mei in the evenings, after the workday was over; he did not request an accommodation to leave the office during the workday to attend appointments with Dr. Mei. (Id. ¶¶ 32-34.)

---

[2] The relevant email is written in Japanese. A translation is available at Oshima Tr. II 25:5-26:14.

Plaintiff was also absent on several occasions for *pro se* court appearances related to his involvement in several legal disputes, namely his matrimonial and child custody matters, and a lawsuit with the management company of his condominium.

Several of Plaintiff's coworkers noticed his absences and complained to Oshima after Plaintiff's work was reassigned to them. (Oshima Tr. I at 190:23-191:10, 192:22-193:15; Haney Tr. at 54:2-5, 57:2-4; Chinn Decl. Ex. 26.)

*D. January 2017 Meeting and Agreement*

On January 4, 2017, Plaintiff sent Oshima an email informing Oshima that he would be out of the office the following morning and would have sporadic access to email and phone. Plaintiff did not provide a reason for his absence.

Oshima responded, "It seems you've been out many if not most mornings recently . . . . What's going on?  Please set a time to discuss with William and me, on Friday morning." (SMBC004150.)

Plaintiff, Oshima, and Haney met to discuss his absences.  Plaintiff explained that the absences were attributable to a combination of his personal legal matters and a condition affecting his feet (he did not refer to plantar fasciitis by its name), for which he was obtaining treatment and physical therapy two to three times a week.

On January 13, Oshima sent Plaintiff a second email memorializing the results of the meeting ("January 2017 Agreement").  The email explained that Plaintiff needed to make "drastic changes immediately to remedy [his] reputation among [his] colleagues and [his] clients," which had been damaged as a result of his perceived pattern of taking time off in an "unpredictable and ongoing matter."  To that end, that agreement provided:

> Doctor's visits, including physical therapy and other requirements: Up to 2 times a week, for absences of 1 – 1.5 hours, is accepted.  Please try to spread them out so

6

they're not on consecutive days, and book them in the middle of the business day, so that you are not perceived as coming in late or leaving early.  When leaving the office for appointments, inform Carey/Patricia via email, with a copy William and Hiro.

(SMBC000146.)

With respect to Plaintiff's legal obligations, the agreement provided:

Other personal commitments, including law suit(s): Discuss in advance with [Oshima], preferably at least a week in advance, of necessary scheduled absences. Try to consolidate several commitments into one block of time, and take them as personal days, whether ½ days or full days.  Be mindful that the unpredictable absences are what is adding to the perception that you are out "all the time."

(*Id.*)

In accordance with that agreement, between January 13, 2017 and September 29, 2017, Plaintiff left the office for 58 doctor's appointments, and on ten other occasions to deal with his ongoing legal matters. He also had five additional unexplained absences.  (Chinn Decl. Exs. 85, 86, 87.)  Plaintiff complied with the agreement's notice requirements on all but two occasions, on January 19 and 20, 2017.  (Chinn Decl. Exs. 45, 46, 47.)

 *E. February 2017 Remote Work Request*

On February 8, 2017, SMBC issued a weather advisory for a forthcoming winter storm on February 9.  The email instructed employees as follows: "If weather conditions prevent you from reporting to work, please ensure that you contact your manger to let them know your situation and location."  (Chinn Decl. Ex. 48.)

The following morning, at 8:49 AM, Plaintiff emailed Oshima to inform him that he planned to work from home that day.  (Chinn Decl. Ex. 50.)  Oshima asked Plaintiff, who lived in Manhattan, why he could not make it to the office, given that public transportation was running. Plaintiff explained that his "trek to the subways present[ed] unplowed areas which are challenging to maneuver through when snow is coming down."  (*Id.*)  Oshima responded again, writing,

Unless you have a medical issue and are uncomfortable walking, or have family care issues, other people make it in. You should not come in if you feel it is a danger to your safety, or if you reasonably cannot make it in because of lack of transportation. Otherwise, take a personal day.

(*Id.*) At 10:51 AM, Plaintiff responded once more, writing, "Given where I live, I'm not comfortable walking outside today. I can likely get a doctor's note. Is that what you want?" (*Id.*)

The following day, Oshima sent an email to Haney and Matthew Judge, an SMBC Human Resources representative. The email, titled "Amley Memo to File," included the following note:

Yesterday during the snow day, he asked not to come in to work from Battery Park due to streets not having been plowed. After I indicated other people with far more difficulty and distance have come in, so he should take the day off on his own personal time, or come in unless he has family care issues or a threat to his safety, he told me he is going to stay home.
Today he submitted his time sheet declaring he worked from home, notwithstanding the above discussion, and I had to reject his time sheet.

(Chinn Decl. Ex. 51.) Oshima instructed Plaintiff to enter a paid personal day into his timesheet instead. (Amley Tr. II 258:5-259:1.)

On February 17, 2017, Oshima sent Plaintiff an email indicating that Oshima and Haney had discussed Plaintiff's timesheet entry for February 9, 2017. (Suess Decl. Ex. 40.) Oshima stated that he understood Plaintiff's February 9 emails to mean that Plaintiff had elected to take a personal day rather than come to the office. Plaintiff responded, "I showed William [Hancy] a note from my doctor as to advice I had received from her. I understood from William that this was likely to be sufficient to permit the day to be coded as 'working from home.' Would you like to see it?" After Oshima forwarded the message to Haney, Haney responded to Plaintiff, saying, "I said you should sort the time sheet out with Hiro [Oshima]. I took the doctor's not [*sic*] as addressing whether you were able to come into the office at least under some circumstances, not whether you were authorized to work from home."

8

*F. Amley Is Terminated*

On September 7, 2017, Plaintiff received a final written warning from Oshima and Haney

("Final Warning"). (Chinn Decl. Ex. 72.)  The warning stated,

> Despite previous counseling and performance evaluations, many clients continue
> to complain about your lack of support.  The problems stem from your inability to
> distinguish between high priority items and issues that may not be material in the
> ordinary course of business, and in communication with clients that are objectively
> seen as unhelpful and inflexible. . . .You have continued to alienate business clients,
> who see you as too difficult to work with.  The advice you give is often seen as not
> helpful or confusing, and a waste of time.  GMs from various departments have
> complained to me, William, and Ikeda san, about needing you to be more
> reasonable and understanding.  The delivery and tone of your interactions are the
> problem, more so than the actual content.

(*Id.*)

On September 29, 2017, Oshima and Haney met with Plaintiff to terminate his

employment.  SMBC allowed Plaintiff to remain on the payroll for an additional two months and

gave him until December 1, 2017 to submit his resignation.  Following the meeting, Oshima sent

an email to Plaintiff, copying Haney and BCC'ing Jude, memorializing their discussion.  The email

stated the following:

> After extended periods during which William, and later I, have counseled you on
> the need to improve the substance and tone of your interactions with your business
> clients, your performance and your reputation with your clients continues to suffer,
> with little indication that you understand what you need to do to improve, or worse,
> what is lacking in your performance.  The time has come to cut the cord.

(SMBC0000304.) Plaintiff submitted his resignation on November 24, 2017, effective December

1, 2017.

## II.   Procedural History

Plaintiff filed this action against SMBC on April 24, 2019.  In his complaint, he alleges

that, while he was employed by SMBC, he was denied FMLA-protected medical leave as well as

9

other reasonable accommodations, and retaliated against for leaving work early on certain days to receive treatment from his doctor and acupuncturist for his plantar fasciitis. He alleges that SMBC's failure to accommodate his medical condition violated the FMLA, the New York State Human Rights Law (NYSHRL), Executive Law §§ 296, *et seq.*, and the New York City Human Rights Law (NYCHRL), N.Y.C. Admin. Code §§ 8-101, *et seq.*, including the anti-retaliation provisions of those statutes.

On February 22, 2021, Plaintiff moved for partial summary judgment on his FMLA interference claim (Count I). (Dkt. 73.) That same day, SMBC cross-moved on Count I and moved for summary judgment on all remaining claims under the FMLA, NYSHRL, and NYCHRL. (Dkt. 82.) Those motions are presently before this Court. For the reasons described below, Plaintiff's motion is denied; Defendant's motion is granted in part and denied in part.

## DISCUSSION

### I.   Legal Standard

Summary judgment must be granted when there is "no genuine dispute as to any material fact and the movant[s] [are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. At summary judgment, the movants bear the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986); *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004).

Once the movants meet that burden, the non-movants may defeat summary judgment only by producing evidence of specific facts that raise a genuine issue for trial. *See* Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002). To

survive summary judgment, the non-movants must present concrete evidence and rely on more than conclusory or speculative claims. *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980). In assessing the record to determine whether genuine issues of material fact are in dispute, a court must resolve all ambiguities and draw all reasonable factual inferences in favor of the non-moving party. *See Parkinson v. Cozzolino,* 238 F.3d 145, 150 (2d Cir.2001).

## II.  SMBC Is Entitled To Summary Judgment Dismissing Count I: FMLA Interference

Plaintiff moves for partial summary judgment on Count I, in which he alleges that SMBC interfered with his FMLA rights.  SMBC cross-moves on Count I on grounds that (1) the claim is time-barred, (2) Plaintiff was not eligible for FMLA leave, (3) Plaintiff failed to provide his employer with sufficient notice, and (4) Defendant did not interfere with Plaintiff's FMLA rights.

Under the FMLA, an eligible employee is entitled to take up to twelve weeks of unpaid leave in any twelve-month period, "Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D). The FMLA also provides that for eligible employees, "leave may be taken intermittently or on a reduced leave schedule when medically necessary."  § 2612(b)(1).

The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." § 2615(a)(1). "A plaintiff may raise separate claims under the FMLA for 'interference' with rights and for 'retaliation'" against the exercise of those rights. *McFarlane v. Chao,* No. 04 Civ. 4871, 2007 WL 1017604, at *28–29 (S.D.N.Y. Mar. 30, 2007) (*citing Potenza v. City of New York,* 365 F.3d 165, 167 (2d Cir. 2004)); *see also Sista v. CDC Ixis North Am., Inc.,* 445 F.3d 161, 175–76 (2d Cir. 2006).

To state a claim for interference with FMLA rights, a plaintiff must demonstrate that: (1) he is an eligible employee under the FMLA; (2) the defendant is an employer as defined by the

11

FMLA; (3) the employee was entitled to take leave under the FMLA; (4) the employee gave notice to the defendant of his intention to take leave; and (5) the employee was denied benefits to which he was entitled under the FMLA. *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 424 (2d Cir. 2016).

Plaintiff claims that Defendant interfered with his rights under the FMLA in the following two ways: (1) when negotiating the January 2017 Agreement, defendants only allowed Plaintiff to attend two doctor's appointments a week during the workday, on nonconsecutive days, and only in the late morning or early afternoon; (2) after Plaintiff stayed home during the February 9, 2018, snowstorm, Oshima instructed him to enter a personal day rather than a workday into his timesheet.

*A. Timeliness*

The FMLA requires that a suit be brought within two years of the claimed violation unless an employer acts willfully in violating the statute, in which case the limitations period is three years. 29 U.S.C. § 2617(a)(4). The term "willful" is not defined in the FMLA; in the law of this Circuit, an employer acts willfully when the employer "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FMLA]." *Porter v. New York Univ. Sch. of Law*, 392 F.3d 530, 531-32 (2d Cir. 2004) (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)). "If an employer acts unreasonably, but not recklessly, in determining its legal obligation, then it should not be considered willful." *Id.* (cleaned up).

Plaintiff filed his complaint on April 26, 2019. (Dkt. 1). The two alleged interferences with Plaintiff's FMLA rights – on January 13, 2017 and February 9, 2017 – took place more than two years before Plaintiff filed this lawsuit. Therefore, if Defendant's treatment of Plaintiff on those two occasions actually interfered with his FMLA rights, his claims are time barred unless the violations were willful.

Willfulness, of course, is an issue that is rarely amenable to summary judgment. However, the issue never needs to be resolved at all. Even construing all undisputed facts in favor of Amley, Plaintiff has failed to raise any genuine issue of material fact concerning whether Defendant interfered with his FMLA rights. In particular, Plaintiff has failed to raise a genuine issue of fact as to either the fourth and fifth elements of an interference claim – notice, and the denial of a benefit to which he was entitled.

*B. Plaintiff Did Not Give SMBC Proper Notice Of His Intent To Take Leave*

Defendant is entitled to summary judgment dismissing Plaintiff's interference claim because on the undisputed facts, Plaintiff failed to give Defendant adequate and proper notice of his intent to take leave.

An employee's right to obtain leave "is premised on his sufficiently alerting the employer to the fact that he is requesting time off for a serious health condition." *Santiago v. N.Y.C. Police Dep't*, No. 05 Civ 3035 (PAC) (MHD), 2007 WL 4382752, at *17 (S.D.N.Y. Dec. 14, 2007) (citing 29 CFR § 825.208(a)(1)). "Nothing in the [FMLA] . . . places a duty on an employer to affirmatively grant leave without such a request or notice by the employee. Rather, to invoke the protection of the FMLA, an employee must provide notice and a qualifying reason for requesting the leave." *Slaughter v. Am. Bldg. Maintenance Co. of N.Y.*, 64 F. Supp. 2d 319, 326 (S.D.N.Y. 1999) (quoting *Brohm v. JH Properties, Inc.*, 149 F.3d 517, 523 (6th Cir. 1998)).

1. Intermittent Leave for Plantar Fasciitis Treatments

Plaintiff never bothered to comply with SMBC's procedures for obtaining intermittent FMLA leave to attend appointments for treatment of his plantar fasciitis during the working day. As a result, his claim for FMLA retaliation fails.

An employee's notice obligations under the FMLA and the accompanying regulations differ somewhat depending on whether the leave begin sought is foreseeable or unforeseeable.

13

The leave that Plaintiff sought for his recurring medical appointments was, without question, foreseeable. Plaintiff was diagnosed with plantar fasciitis in August 2016. By January 2017, when Plaintiff negotiated an acceptable course of action with Oshima and Haney, Plaintiff knew that he would need to obtain treatment periodically and that he would have to leave work to do so. In fact, by the time the Agreement was negotiated, he had been leaving work to attend these appointments for more than four months. Plaintiff offers no evidence that he ever asked anyone for permission to take leave to attend these appointments, let alone that he did so pursuant to his employer's procedures for seeking FMLA leave – which were never followed. Indeed, it was precisely because his frequent absences were unexcused and not on notice that Oshima sat down with Plaintiff to devise some arrangement that would accommodate both Plaintiff's medical needs and his employer's interest in having him at work. This employer-initiated intervention resulted in the January 2017 Agreement -- an arrangement to which all parties consented.

The federal regulations interpreting the FMLA provide:

> An employee must provide the employer at least thirty (30) days advance notice before FMLA leave is to begin if the need for the leave is foreseeable based on . . . planned medical treatment for a serious health condition. . . . If thirty (30) days is not practicable . . ., notice shall be given as soon as practicable. . . .

29 C.F.R. § 825.302(a).

With respect to an employer's particular notice requirements, the regulations provide:

> An employer may require an employee to comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances. For example, an employer may require that written notice set forth the reasons for the requested leave, the anticipated duration of the leave, and the anticipated start of the leave. . . . An employee also may be required by an employer's policy to contact a specific individual.

§ 825.302(d). The version of SMBC's FMLA policy that was in effect in January 2017 required employees to contact their HR Representative to arrange a meeting to discuss the putative leave at

14

least 15 days – more generous than the 30 days required by the FMLA – before the leave could commence, whereupon the employee would be required to submit a completed "Request for FMLA Leave" to the representative." (Chinn Decl. Ex. 7.)

It is uncontested that Plaintiff never took any of these steps. Even though he had signed a form acknowledging receipt of SMBC's handbook, which detailed the company's policy, and he knew how to contact Human Resources (Chinn Decl. Exs. 8, 9; Amley Tr. II at 194:6-196:18), Plaintiff never contacted his HR Representative or met with anyone in Human Resources to ask for FMLA leave pursuant to SMBC's procedures. (Amley Tr. II at 194:22-195:4, 199:14-20). Plaintiff cannot point to any "unusual" or "emergency" circumstances that precluded him from applying through the established channels. Plaintiff instead sought permission to attend appointments from Oshima – and then only after Oshima contacted Plaintiff regarding his frequent and absolutely permission-less absences for four months.

It is also indisputable that Plaintiff did not give his employer *timely* notice – i.e. 15 days' advance notice under SMBC's internal policy, or 30 days' advance notice under the FMLA – to *anyone* at SMBC. (Amley Tr. at 199:14-20.) Nor did he give notice "as soon as practicable," which would have been in August 2016, when he learned that he would need multiple treatments each week for his foot condition. *See Slaughter*, 64 F. Supp. 2d at 326 (collecting cases). Instead, he started leaving the office during the workday without first obtaining permission – or, at times, even notifying his supervisors that he would be away. And when he did alert his supervisors to his absence, as he finally did on January 4, 2017, he failed to provide any information that would have alerted them to the fact that he was requesting time off for a serious health condition. *See Santiago*, 2007 WL 4382752, at *17.[3]

---

[3] For purposes of this motion the court will assume that the plantar fasciitis – a painful but common condition affecting the heel – qualifies as a "serious" health condition.

15

No reasonable factfinder could conclude, based on those undisputed facts, that Plaintiff provided Defendant with notice of his intent to take leave.

2. February 2017 Snowstorm Remote Work Request

Plaintiff's emails to Oshima on the morning of February 9, 2017 similarly do not constitute "notice" of a request for FMLA leave under the FMLA.

As the regulations make clear, even when the need for leave has arisen unexpectedly, an employee must nonetheless give notice to the employer "as soon as practicable," and "provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request." 29 C.F.R. § 825.303(a)-(c). An employee seeking a new and "unforeseeable" FMLA leave "must specifically reference either the qualifying reason for leave or the need for FMLA leave. 29 C.F.R. § 825.303(b). "When timely and adequate communication is not given, the protections of the Act do not apply, even if the employee in fact has a serious health condition." *Tsatsani*, 2020 WL 6688939, at *19 (quoting *Rodriguez v. Smithfield Packing Co., Inc.*, 545 F. Supp. 2d 508, 525-26 (D. Md. 2008).

The undisputed facts show that Plaintiff emailed the wrong person – Oshima, not HR – to ask for leave so he would not have to come to the office during a snowstorm. But that might be excusable, since SMBC's weather advisory email instructed employees to email their managers if they could not commute to the office. What is not excusable is the undisputed fact that Plaintiff did not mention any illness or disability as justification for staying home. He first said it would be difficult for him to get to the subway in the snow – something that is true for many people during a snowstorm, including many who have no medical condition, but simply find it difficult to walk on slippery surfaces. Amley's statement did not alert Oshima to plaintiff's alleged medical reason for needing to remain at home during the storm.

16

When Oshima responded that plaintiff could only stay home if he had a medical reason to do so, Plaintiff responded that he did not feel "comfortable" coming in and could "likely" get a doctor's note if Oshima wanted one. He offered no medical reason for not feeling "comfortable;" he never mentioned his plantar fasciitis, or any other condition that would have alerted Oshima to the fact that he was making a FMLA request. (Chinn Decl. Ex. 50.) A representation that he could "likely get a doctor's note" hardly indicated that Plaintiff had a serious medical condition that qualified him for leave pursuant to the FMLA.

Plaintiff effectively admits that he did not comply with FMLA's requirements on February 9, 2017, but argues that he did not have to do so because Defendant was already on notice that he had a qualified reason for requesting leave. He is referring to the fact that he had told Oshima and Haney a month earlier that he suffered from a foot condition that required him to attend frequent treatments.

But this argument fails to raise any genuine issue of fact. "Even where, as here, the employee previously told [his] employer that [he] had a serious medical condition, the employer is not required to presume that every and any subsequent illness or medical mishap is due to that condition and therefore FMLA-eligible. *Tsatsani*, 2020 WL 6688939, at \*19 (citing *Slaughter v. Am. Bldg. Maintenance Co. of N.Y.*, 64 F. Supp. 2d 319, 327-28 (S.D.N.Y. 1999). "Merely calling in sick . . . is insufficient to put a company on notice that an employee is requesting leave that may be eligible under the FMLA." *Slaughter*, 488 F. Supp. 2d at 409. an "employer is not required to be clairvoyant." *Brown*, 488 F. Supp. 2d at 409 (internal quotation and citation omitted). Accordingly, Oshima's general awareness of Plaintiff's foot problem did not relieve Plaintiff of the obligation to advise Oshima that he needed to take FMLA leave *because* of his foot problem. *See Slaughter*, 64 F. Supp. 2d at 327-28.

Plaintiff has thus failed to raise a triable issue of fact as to whether he can satisfy the notice element of an interference claim.

### C. *Plaintiff Was Not Denied Benefits To Which He Was Entitled*

Even assuming that Plaintiff did satisfy his obligation to give his employer timely notice of his condition, his interference claim fails because Defendant never denied Plaintiff any benefit to which he was entitled under the FMLA.

Section 2617 of the FMLA, which creates a private right of action for employees who were damaged by an employer's violation of the statute, forecloses relief "unless the employee has been prejudiced by the violation." *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002). The FMLA provides that "an employer may require the employee[] to substitute any of the accrued paid vacation leave, personal leave, or family leave of the employee for [FMLA] leave." 29 U.S.C. § 2612(d)(2)(B). Accordingly, courts in this Circuit have held that an employee's interference claim fails in circumstances where an employer granted the employee the full amount of time requested as paid "sick leave" or "personal leave." *See Greenberg v. State Univ. Hosp. – Downstate Med. Ctr.*, 83 F. App'x 603, 606 (2d Cir. 2020); *Blodgett v. 22 South St. Operations*, No. 3:17-cv-766 (VAB), 2019 WL 2913844 (D. Conn. July 8, 2019) *aff'd*, 828 F. App'x 1, 5 (2d Cir. 2020).

The January 2017 Agreement gave Plaintiff leave to attend two appointments per week during the workday, each for 1 to 1.5 hours. This was consistent with his assertion that his condition required treatment two to three times a week (Amley Tr. I 127:4-20, 129:4-13), and his estimate that appointments would last between 1 and 1.5 hours (Amley Tr. I 122:14-22). It is undisputed that SMBC followed through on its end of the bargain; at no time did Oshima or Haney ever prevent Plaintiff from attending subsequent workday appointments with Dr. Artandi. (Amley Tr. I 175:20-176:20; Amley Tr. II 35:8-36:19.)   And it is undisputed that Plaintiff was not required

18

to use vacation, sick leave or personal days to attend these appointments – even though, under the FMLA, his employer could have required him to use that time – and he was not docked pay for the time that he missed.   (Amley Tr. II 34:21-36:19.)   No reasonable factfinder could conclude that Plaintiff, a salaried employee who was not paid by the hour, was prejudiced by the fact that his time away from the office was not classified as (unpaid) FMLA leave. *See Santiago*, 2007 WL 1382752, at \*7.

Nonetheless, Plaintiff contends that he was denied benefits under the FMLA because he was restricted to two workday appointments per week in the middle of the business day. Plaintiff alleges that this limited his ability to seek treatment from Dr. Artandi and required him to make a round trip between the SMBC's office and doctor's office.

But the FMLA does not require employers to automatically acquiesce to whatever timetable an employee seeking intermittent leave offers.   The federal regulations provide, "If an employee needs leave intermittently or on a reduced leave schedule for planned medical treatment, then *the employee must make a reasonable effort to schedule the treatment so as not to disrupt unduly the employer's operations*."   29 CFR § 825.203 (emphasis added). The regulations further provide that "employees are ordinarily expected to consult with their employers prior to the scheduling of treatment in order *to work out a treatment schedule which best suits the needs of both the employer and the employee.*"   *Id.* (emphasis added).

That is precisely what the January 2017 Agreement accomplished. Per the Agreement, Plaintiff was allowed two appointments per week during the work day. He was asked to "try to spread them out so they're not on consecutive days, and book them in the middle of the business day" so as to limit workplace disruptions.  These were attempts to accommodate Plaintiff's needs without unduly disrupting the employer's operations. Moreover, Plaintiff agreed to these

parameters (Amley Tr. I 129:4-131:3); he even answered, "Yes" when Oshima asked him whether two appointments during the workday per week was sufficient. (Oshima Tr. I at 236:12-14.) And while Plaintiff now argues (by way of his self-serving declaration) that the agreement prevented him from attending a third weekly appointment, the undisputed evidence shows that Plaintiff was able to schedule appointments with Dr. Artandi until at least 6:30 PM – i.e., after the work day ended. (Amley Tr. I 78:7-80:10.)

In short, Plaintiff was given all of the time away from the office that he asked for, pursuant to an agreed-upon schedule that was, at the time, agreeable to both Plaintiff and Defendant. Plaintiff has not produced any evidence showing that he was prevented from attending any appointment or discouraged from scheduling any appointments. Therefore, he was not prejudiced in any way by the fact that his time away from the office was not classified as FMLA leave. Ergo, the conditions set forth in the September 2017 Agreement cannot serve as a basis for his FMLA interference claim.

With respect to his request to work remotely on the snow day, it is undisputed that Plaintiff was allowed to stay at home on February 9, 2019, and that he was given a personal day, for which he was paid in full. Assuming *arguendo* that Plaintiff was eligible for and provided adequate notice of his intent to take leave, Defendant was full within its rights to require that Plaintiff to take a paid personal day instead of FMLA leave under the provisions of the statute. *See* § 2612(d)(2)(B). Accordingly, no reasonable factfinder could conclude that Plaintiff was denied any benefit under the FMLA, let alone prejudiced by any purported violation of the statute. *See Ragsdale*, 535 U.S. at 89.

Moreover, in this Court's opinion, Plaintiff could not have been denied any benefit under the FMLA because what he asked for was not FMLA leave. Plaintiff wanted to stay home because

20

of the weather and work from home and get paid for doing so. During FMLA leave an employee cannot perform any work and does not get paid. *Smith v. Westchester Cty.*, 769 F. Supp. 2d 448, 462 (S.D.N.Y. 2011). What Plaintiff sought is not what the leave that FMLA contemplates. *See Hahn*, 2016 WL 4120517, at *4. He wanted a personal day.

Finally, Plaintiff contends that he satisfies this element of an interference claim because SMBC failed to provide him with adequate notice of his benefits under the FMLA when negotiating the September 2017 Agreement or when directing him to use a personal day on February 9, 2017. He makes much of the fact that neither Oshima nor Haney conferred with HR, and Matt Judge, the Human Resources representative, "did nothing because he wrongly assumed Plaintiff had been given an accommodation." He argues that Oshima, Haney, and Judge effectively blocked his access to FMLA benefits by failing to fulfil their own obligations under the FMLA.

Plaintiff puts the proverbial carb before the horse. Defendant had no obligation to inquire further into Plaintiff's condition or inform him of his rights under the FMLA unless Defendant was first properly notified by Plaintiff, pursuant to company procedures. *See Slaughter*, 64 F. Supp. 2d at 327. As discussed above, it is undisputed that the Plaintiff did not comply with SMBC's FMLA notification procedures at any time. That alone defeats any FMLA interference claim predicated on an employer's failure to give notice. *See Tully-Boone v. North Shore-Long Island Jewish Hosp. Sys.*, No. 08-CV-2497 (ADS)(WDW), 2010 WL 11632652, at *11-12 (E.D.N.Y. May 3, 2010).

Additionally, the Second Circuit has explicitly rejected an independent right of action for a technical failure to provide notice of FMLA rights, as long as the plaintiff was ultimately given the leave (whether FMLA or substituted sick, personal, or vacation leave) that he requested. *See See Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 162 (2d Cir. 1999); *Hahn v.*

*Office & Prof. Emps. Int'l Union, Local 153*, No. 13-CV-946 (JGK), 2016 WL 4120517, at *4 (S.D.N.Y. July 22, 2016). Here plaintiff got the time off, and the snowy day off, that he wanted.

Because Plaintiff has failed to raise a genuine issue of fact as to whether he was denied a benefit under the FMLA, his motion for partial summary judgment is denied, and Defendant's cross motion for summary judgment dismissing Count I is granted.

## III.   SMBC Is Entitled To Summary Judgment Dismissing Count II: FMLA Retaliation

In Count II, Plaintiff claims that Defendant unlawfully retaliated against him for exercising his FMLA rights, in violation of § 2615(a)(1), by (1) terminating Plaintiff after giving him a warning, (2) giving him a negative FY 2016 performance review on March 30, 2017, (3) imposing "new conditions" on his employment, (4) reducing his FY 2016 discretionary bonus, and (5) rejecting his timesheet after he stayed home on February 9, 2017.

Where, as here, a plaintiff brings an FMLA retaliation claim without offering any direct evidence of the employer's retaliatory intent, the claim is evaluated under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Kim v. Goldberg, Weprin, Finkel Goldstein, LLP*, 862 F. Supp. 2d 311, 317 (S.D.N.Y. 2012). Thus, to state a *prima facie* case for a FMLA retaliation claim, Plaintiff must demonstrate that "(1) he exercised rights protected under the FMLA; (2) he was qualified for his position, (3) he suffered an adverse employment action, and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Graziadio*, 817 F.3d at 429. If the plaintiff can make out a *prima facie* case, the burden shifts to the defendant to "demonstrate a legitimate, non-discriminatory reason for its actions; if the defendant does so, the plaintiff must then show that the defendant's proffered explanation is pretextual." *Id.*

22

*A.  Plaintiff Did Not Exercise An FMLA-Protected Right*

The first element of a *prima facie* case of retaliation requires the plaintiff to have exercised his FMLA rights.  It is here that plaintiff is out of court.

"A plaintiff fails to exercise rights protected under the FMLA when the employee does not . . . invoke the FMLA." *Hahn*, 2016 WL 4120517, at *5 (citing *Wahl v. Cty. of Suffolk*, 466 F. App'x 17, 20 (2d Cir. 2012).  Accordingly, a defendant is entitled to summary judgment on an FMLA retaliation claim where the plaintiff cannot show that he complied with the procedural requirements to obtain FMLA leave, *see Kim*, 862 F. Supp. 2d at 318; *Brown v. The Pension Bds.*, 488 F. Supp. 2d 295, 410 (S.D.N.Y. 2007), even when he might otherwise have qualified for FMLA leave, *Robles v. Medisys Health Network, Inc.*, No. 19-cv-6651 (ARR) (RML), 2020 WL 3403191, at *18 (E.D.N.Y. June 19, 2020).  *See also Vives v. N.Y.C. Dep't of Corrections*, No. 15-CV-06127 (MKB), 2019 WL 1386738, at *18 (E.D.N.Y. Mar. 27, 2019).

Plaintiff in this case never exercised an FMLA-protected right and thus cannot claim the statute's protections.

For substantially the same reasons discussed *supra* in Part II.B.1, the January 2017 Agreement does not constitute an exercise of Plaintiff's FMLA-protected rights because Plaintiff did not follow SMBC's procedures for requesting FMLA leave. *Kim*, 862 F. Supp. 2d at 318.  He never contacted Human Resources to arrange a meeting to discuss the putative leave, and he did not give notice of his intent to take leave thirty (under the FMLA) or fifteen (under SMBC's policy) days in advance, or "as soon as practicable."  While Plaintiff may have obtained paid intermittent leave for his medical condition, he did not do so under the FMLA. *Hahn*, 2016 WL 4120517, at *5.

The same is true of the February 2017 Remote Work Request.  Plaintiff contacted Oshima, not Human Resources, seeking permission to stay home that day; he did not explain to Oshima

that he wanted to stay home in order to attend to a serious medical condition.   (*See supra*, Part II.B.2.)

Because Plaintiff has failed to raise a triable issue as to whether he exercised rights under the FMLA, his FMLA retaliation claim is dismissed in its entirety.

### B.  *Plaintiff Has Not Made A Prima Facie Case Of Retaliation For The February 2017 Remote Work Request*

Even if one were to assume that Plaintiff exercised a FMLA-protected right during the February 9 snowstorm (simply by virtue of the fact that he offered (and eventually showed) his supervisor a doctor's note), Defendant is entitled to summary judgment on Count II because Plaintiff cannot make out a *prima facie* case that he was retaliated against for exercising that right.

#### 1.  Adverse Employment Action

As an initial matter, of the five acts of retaliation alleged by Plaintiff, two – the rejection of his timesheet on February 17, 2017, and the "new conditions" that Oshima imposed on his employment – do not amount to adverse employment actions under the FMLA.  This alone does not warrant dismissal of Plaintiff's retaliation claim, as there remain three alleged acts of retaliation that do constitute adverse actions.  However, the Court finds it prudent to briefly address this third element of a retaliation claim.

"For purposes of the FMLA's anti-retaliation provision, a materially adverse action is any action by the employer that is likely to dissuade a reasonable worker in the plaintiff's position from exercising his legal rights." *Millea v. Metro-N. R. Co.*, 658 F.3d 154, 164 (2d Cir. 2011). Examples of a materially adverse employment action include "a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities," *Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (citation omitted), or a "formal reprimand," *Millea*, 658 F.3d at 165. The standard must be

objective; the test is whether a "reasonable" employee would be deterred, and does not take into consideration a plaintiff's "unusual subjective feelings*." Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68-69 (2006). "[P]etty slights, minor annoyances, and simple lack of good manners will not give rise to actionable retaliation claims." *McAvey v. Orange-Ulster BOCES*, No. 07 Civ. 11181 (RWS), 2012 WL 161839, at *3-*4 (S.D.N.Y. Jan. 18, 2012) (internal quotation marks omitted) (quoting *Millea*, 658 F.3d at 165).

Oshima's rejection of Plaintiff's timesheet does not qualify as an adverse employment action. For one thing, as noted above, SMBC was permitted to require Plaintiff to take a personal day for staying home during the snow storm. For another the rejection of a day's time sheet – for a day on which the employee was paid in full, despite his absence – is not so harmful or materially adverse as to "dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 57. Plaintiff insists (with no factual support) that as a result of his treatment on February 9, 2017, he was deterred from challenging any comments during his FY 2016 review, the Final Warning meeting, or when he was terminated. However, the standard is an objective one, and does not take into account Plaintiff's "unusual subjective feelings." *Id.* at 68-69. Even if the loss of a personal day might have left Plaintiff with a bad taste, it amounts to nothing more than a minor and nonactionable annoyance.

Similarly, the so-called "new conditions" that Oshima subjected Plaintiff to – namely, requiring him to arrive at the office no later than 9:00 AM and leave no earlier than 5:30 or 6:00 PM (excluding appointments with Dr. Artandi) – as well as telling him that he needed to perform "at 120%" in order to rehabilitate his reputation among coworkers – are consistent with actions that other courts in this district have repeatedly found not to constitute adverse actions. *See Dearden*, 2017 WL 4084049, at *8; *Rivera v. Orange Cty.*, No. 10 Civ. 9134 (VB), 2013 WL

812016, at *9 (S.D.N.Y. Mar. 5, 2013); *Milne v. Navigant Consulting*, No. 08 Civ. 8964 (NRB), 2010 WL 4456853, at *8 (S.D.N.Y. Oct. 27, 2010); *Smalls v. Allstate Ins. Co.*, 396 F. Supp. 2d 364, 371 (S.D.N.Y. 2005). There is nothing "adverse" about requiring an employee to arrive at work on time and to be present throughout the regular the work day. Plaintiff was a salaried employee, so the fact that he was instructed to stay 30 minutes past SMBC's general end-of-day – as many of his coworkers already did (Oshima Tr. I at 256:16-20; Haney Tr. at 17:8-18:12) – does not mean that Plaintiff lost out on any overtime pay, which would have been an adverse action. And Oshima's comment was precisely the sort of criticism that a boss is entitled to level at an under-performing employee. Nothing in the FMLA requires an employer to refrain from criticizing an employee's performance or requiring him to do what it takes to regain the trust of his co-workers. The terms of plaintiff's employment did not change; being told to perform "at 120%" did not constitute an adverse employment action.

## 2. The Facts In The Record Do Not Give Rise To An Inference Of Retaliatory Intent

With respect to the remaining alleged adverse acts – the negative FY 2016 performance review, reduced FY 2016 bonus, and Plaintiff's termination – the circumstances adduced from the undisputed record do not give rise to an inference of retaliatory intent.

An inference of retaliation can be established: "(i) indirectly through a showing that the protected activity was followed closely by discriminatory treatment, commonly known as 'temporal proximity;' (ii) indirectly through other evidence such as disparate treatment of similarly-situated employees; or (iii) directly through a showing of evidence of retaliatory animus toward plaintiff by defendant." *Alexander v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, 107 F. Supp. 3d 323, 328-29 (S.D.N.Y. 2015) (citing *Carr v. WestLB Admin., Inc.*, 171 F. Supp. 2d 302, 309 (S.D.N.Y. 2001)), *aff'd sub nom. Alexander v. The Bd. of Educ. of City of N.Y.*, 648 F. App'x

26

118 (2d Cir. 2016). Plaintiff has presented no direct evidence of retaliatory animus, and has not established a causal nexus through either temporal proximity or disparate treatment.

"A close temporal relationship between the exercise of a protected right and an adverse employment action can, in some cases, sustain the conclusion that the action was a retaliation for the exercise of the right." *Kim*, 862 F. Supp. 2d at 319. Although the Second Circuit has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship, "district courts within the Second Circuit have consistently held that the passage of more than two to three months between the protected activity and the adverse employment action militates against an inference of causation." *Id.* (internal citations omitted).

Two of the alleged adverse actions fall too far outside of that time frame to support an inference of retaliatory intent. Defendant reduced Plaintiff's bonus in June 2017, four months after the February 2017 Remote Work Request.[4]  Plaintiff was fired on September 29, 2017, more than seven months after the alleged protected activity.  Both gaps in time are too long to generate the retaliatory inference that Plaintiff seeks.

As to the negative performance review – "Where timing is the only basis for a claim of retaliation and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001); *see also Sotomayor v. City of N.Y.*, 862 F. Supp. 2d 226, 253 (E.D.N.Y. 2012), *aff'd* 713 F.3d 163 (2d Cir. 2013). In this case, timing is the only basis for Plaintiff's claim that he was retaliated against for asking to work from home on February 9, 2017;

---

[4] Plaintiff contends that the decision to reduce his bonus took place on an unspecified date in January 2017. If that were true, then the adverse action predated the February 2017 Remote Work Request and so could not support Plaintiff's retaliation claim.

27

the record contains no evidence that Plaintiff was treated differently than similarly situated individuals with a history of negative performance reviews.

The undisputed record shows that Plaintiff started receiving negative comments and feedback about his performance long before February 9, 2017.

Plaintiff and Oshima had several discussions dating back to 2014 (before Oshima was Plaintiff's manager), in which Oshima told Plaintiff that he was not satisfied with his performance – including for the incident on June 30, 2014, when Plaintiff simply refused to participate and facilitate a deal closing – behavior that could and would have gotten a lawyer fired by many less generous employers. (Chinn Decl. Exs. 16, 17; Oshima Tr. I at 51:3-23.) Plaintiff's only response is that, in his opinion, the deal was not going to close anyway. But it is undisputed that (1) Plaintiff stopped responding to emails from the client, (2) the client contacted Oshima about Plaintiff's unresponsiveness, and (3) Oshima was displeased that he had to take over for Plaintiff. (Chinn Decl. Ex. 17.) That led to completely justified criticism of his performance.

The negative feedback from clients continued after Oshima became Plaintiff's manager on November 1, 2015. While Amley disagrees with SMBC about the exact number of client complaints about his performance, it is undisputed that some clients did in fact tell Haney and Oshima that they were unhappy with both Plaintiff's advice and his attitude. (Chinn Decl. Exs. 15, 19, 23, 24; Oshima Tr. I at 53:6-55:19.) And Plaintiff's coworkers repeatedly complained about his absences and lack of responsiveness, because Plaintiff's unfinished work was often reassigned to them. (Chinn Decl. Exs. 26, 58; Oshima Tr. I at 54:25-56.5, 71:1-4, 196:10-18.) These are serious performance defalcations, worthy of criticism, and they occurred long before Plaintiff stayed home for a day during a snowstorm.

Plaintiff's clients, supervisor, and coworkers' dissatisfaction with his work and attitude is reflected in two instances of "adverse employment action" that predate any protected activity. Plaintiff received a negative performance review from Oshima on March 29, 2016, covering the period from April 1, 2015 to March 31, 2016 ("FY 2015"). In that review, Oshima evaluated Amley's "Overall Job Competency" as "Gaps" – the lowest of three possible rankings. (Chinn Decl. Ex. 19.) Plaintiff also received a lower bonus for FY 2015 than he had for the previous year. (Chinn Decl. Ex. 20.)

So by the time Plaintiff asked to work from home on February 9, 2017, he had already received a middling performance review in mid-2016 for his work during FY 2015, a lower FY 2015 bonus than he had received for FY 2014, several critical emails from Oshima, and negative feedback from clients who were displeased with his services. This is an extensive record of formal and informal communications of problems that managers and clients perceived with Plaintiff's performance, as well as a gradual increase in adverse employment activity that predates any of the alleged protected activity. *Woolf v. Bloomberg L.P.*, No. 16-cv-6953, 2019 WL 1046656, at *14 (S.D.N.Y. Mar. 5, 2019). No reasonable trier of fact could infer a causal connection between Plaintiff's request to work from home and his negative FY 2016 performance review (given on March 30, 2017), reduced FY 2016 bonus (disbursed in June 2017), or termination. *Id.* (citing *Slattery*, 248 F.3d at 95).

Plaintiff contends that there is a triable issue as to Defendant's retaliatory intent on the basis of his deposition testimony, in which he stated that Oshima mentioned his absences for medical visits during the Final Warning and termination meetings. Whether or not this is true is immaterial to whether Defendant retaliated against Plaintiff for the February 2017 Remote Work Request, because the snowstorm request had nothing to do with Plaintiff's missing work for

doctor's appointments. Although Amley's testimony (which is contradicted by other evidence in the record) would be relevant to a retaliation claim premised on the January 2017 Agreement, as discussed *supra*, Plaintiff is not protected under the FMLA with respect to that agreement because he did not follow SMBC's procedure for requesting foreseeable leave.

Plaintiff has therefore failed to introduce sufficient evidence to create a genuine issue of material fact with respect to whether Defendant decreased his bonus and terminated him under circumstances creating an inference of retaliatory intent.

## C. *Plaintiff Had Legitimate, Non-Pretextual Reasons For Taking The Alleged Adverse Actions*

The evidence described *supra*, in addition to precluding any inference of retaliatory intent, satisfies Defendant's burden of proffering a legitimate, non-discriminatory reason for the alleged adverse actions under the second step of *McDonnell-Douglas*. And were I to reach the third step of *McDonnell Douglas*, it is clear that Plaintiff failed to raise a genuine issue of fact concerning pretext.

A plaintiff can demonstrate pretext "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered reason, or by providing evidence such that a reasonable factfinder could conclude that the prohibited reason was a 'motivating factor' in the adverse employment action." *Greenberg*, 838 F. App'x at 606 (internal quotations and citation marks omitted). "Only where an employer's business decision is so implausible as to call into question its genuineness should [a] [c]ourt conclude that a reasonable trier of fact could find that it is pretextual." *Barletta v. Life Quality Motor Sales Inc.*, No. 13-CV-02480, 2016 WL 4742276, at *5 (E.D.N.Y. Sept. 12, 2016); see also *Kim*, 862 F. Supp. 2d at 320. The burden of persuasion remains at all times with the plaintiff. See *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993).

30

Plaintiff has not provided any evidence that goes to show that his February 9, 2017 request for leave was a motivating factor in any of the alleged adverse employment actions. Instead, he argues that (1) contradictions in Oshima's deposition testimony, (2) the fact that he disagrees with Oshima and clients' criticisms of his work, and (3) the negative feedback he received from Oshima during his FY 2015 review on March 29, 2016 are evidence that Defendant's proffered reasons are pretextual.

Plaintiff's arguments are unpersuasive.

*First*, a careful examination of the record reveals that the so-called "contradictory" answers in Oshima's testimony were not contradictory at all; they were given in response to different questions. For example, Plaintiff contends that Oshima repeatedly changed his answer when asked how many clients complained about Plaintiff and how often. Plaintiff has cherry picked select quotes from Oshima's testimony in an attempt to manufacture disputed facts; when read in full, it is evident that Oshima testified that (1) there were more than a dozen complaints during FY 2015 (Oshima Tr. I at 53:6-8), (2) he and Haney received fewer complaints about Plaintiff prior to FY 2015, when he was "embedded" in another department and had a different direct supervisor (*id.* at 53:9-21), and (3) the complaints about Plaintiff increased in volume over time (*id.* at 53:3-5). There is nothing inconsistent about those answers. Plaintiff points to no other evidence that undermines Oshima's testimony and the numerous other documents reflecting his client's dissatisfaction. In short, Plaintiff's citation to Oshima's testimony fails to raise a triable issue of fact as to whether Defendant's proffered reasons are pretextual.

*Second*, the fact that Plaintiff disagrees with the negative feedback that he received from his supervisors and clients "cannot standing on its own show that his employer's asserted reason for termination was pretextual." *Ricks v. Conde Nast Publ'ns, Inc.*, 92 F. Supp. 2d 338, 347

31

(S.D.N.Y. 2000), *aff'd*, 6 F. App'x 74 (2d Cir. 2001) (cleaned up). Nor does the fact that, on one occasion, Oshima agreed with the advice given by Plaintiff about which a client had complained. (*see* Chinn Decl. Ex. 54).[5] As long as any clients were dissatisfied with Plaintiff's services – and the evidence unambiguously demonstrates that they were – that remains a legitimate and non-pretextual reason for taking adverse employment actions against Plaintiff.

*Third*, Plaintiff argues that his FY 2015 review – which was the first he received from Oshima instead of Haney – was significantly more critical than any of his prior reviews, and that this change is evidence of pretext. But Plaintiff's FY 2015 review took place long before he purportedly exercised his FMLA rights on February 9, 2017 (or even before the January 2017 Agreement) – in fact, it took place before Plaintiff was diagnosed with plantar fasciitis. So this review cannot possibly be evidence of Oshima's intent to retaliate against Plaintiff for exercising his FMLA rights. And in any event, "A change in management's evaluation of an employee's performance cannot by itself raise an inference of pretext," and "such an inference is even less permissible when a new supervisor is appointed, who is entitled to set his own standards and agenda." *Gambello v. Time Warner Commc'ns*, 186 F. Supp. 2d 209, 222 (S.D.N.Y. 2002) (citing, *inter alia*, *Brown v. Time, Inc.*, No. 95 Civ. 10081(MBN), 1997 WL 231143, at *12 (S.D.N.Y. May 7, 1997)). It is evident that Oshima had tougher standards for Plaintiff's performance than Haney, and Plaintiff struggled to meet those standards. But Plaintiff "cannot use h[is] past performance to shield h[im] from two years of unsatisfactory performance evaluations." *Davies v. N.Y.C. Dep't of Educ.*, 563 F. App'x 818, 820 (2d Cir. 2014).

The Court therefore concludes that Defendant has proffered a legitimate, non-retaliatory explanation for Plaintiff's FY 2016 bonus and performance review and eventual termination.

---

[5] Both Haney and Oshima nonetheless took issue with the tone Plaintiff used in his email to the client.

Plaintiff offers no evidence that could raise a question of fact as to whether these explanations were pretextual.

For all of the above reasons, Defendants are entitled to summary judgment dismissing Count II.

## IV. SMBC Is Entitled To Summary Judgment Dismissing Plaintiff's State Law Reasonable Accommodation, Discrimination and Retaliation Claims, and City Law Reasonable Accommodation and Retaliation Claims, but Not The City Law Discrimination Claim

The Court turns next to Plaintiffs' claims under the New York State Human Rights Law ("NYSHRL") and New York City Human Rights Law ("NYCHRL"). Plaintiff brings claims for disability discrimination – which includes the failure to provide an employee with a reasonable accommodation for his disability, *see Nieblas-Love v. N.Y. Housing Auth.*, 165 F. Supp. 3d 51, 73 (S.D.N.Y. 2016) – and retaliation.

### A. Retaliation

To establish a *prima facie* case of retaliation under the NYSHRL and NYCHRL, a plaintiff must show that he (i) engaged in protected activity; (ii) the defendant was aware of that activity; (iii) he was subjected to an adverse action; and (iv) there is a causal connection between the protected activity and the adverse action. *Forrest v. Jewish Guild for Blind*, 3 N.Y.3d 295, 312-13 (2004). Defendant is entitled to summary judgment because Plaintiff has failed to raise a triable issue of fact as to the first element: engagement in protected activity.

An employee engages in a protected activity when he complains of an employment practice that he reasonably believes violates the law.[6] *Mayers v. Emigrant Bancorp, Inc.*, 796 F. Supp. 2d

---

[6] Effective November 11, 2019, New York City amended its Human Rights Law to make "clear that requesting a reasonable accommodation is a protected activity under the NYCHRL." *Piligian v. Icahn Sch. of Med. at Mount Sinai*, 490 F. Supp. 3d 707, 722 (S.D.N.Y. 2020). That amendment had not yet taken effect at the time Plaintiff made his requests to SMBC, was fired from SMBC, or filed the complaint in the present action. Because there is no indication that the New York City Council intended for the amended NYCHRL to apply retroactively, *id.*, I must adhere to the New York courts' prior interpretation of the statutes. For the reasons set forth in my opinion in

434, 448 (S.D.N.Y. 2011) (citing *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000)).

Accordingly, to satisfy the first element of a *prima facie* case of retaliation, a plaintiff must show

that she engaged in "an activity taken in good faith to protest or oppose statutorily prohibited

discrimination." *Sletten v. LiquidHub, Inc.*, 2014 WL 3388866, at *1 (S.D.N.Y. July 11,

2014) (quoting *Morgan v. N.Y. State Att'y Gen.'s Office*, 2013 WL 491525, at *9 (S.D.N.Y. Feb.

8, 2013)). "While plaintiff may have believed that [he] was the victim of discrimination, an

undisclosed belief of such treatment will not convert an ordinary employment complaint into a

protected activity." *Aspilaire v. Wyeth Pharm., Inc.,* 612 F.Supp.2d 289, 309 (S.D.N.Y. 2009). If

the discriminatory nature of the complaint is not "readily apparent," the onus is on the speaker to

clarify to the employer that he is complaining of unlawful discrimination, rather than unfair

treatment generally. *Mayers*, 796 F. Supp. 2d at 448.

Here, there is no evidence showing that Plaintiff, at any point, engaged in protected activity

by protesting or opposing statutorily prohibited discrimination. Taking FMLA leave on its own

does not constitute "opposition" to an unlawful employment practice. *Corrado v. N.Y. Unified

Court Sys.*, 163 F. Supp. 3d 1, 26 (E.D.N.Y. 2016), *aff'd*, 698 F. App'x 36 (2d Cir. 2017). Plaintiff

concedes that he never "protested" any of the terms of the January 2017 Agreement.

With regard to the February 2017 Remote Work Request, Plaintiff contends that he

"objected to being charged a personal day since he worked from home." (Dkt. 112 at 7). That is

insufficient to establish that Plaintiff engaged in protected activity. The only objection in the

record is Plaintiff's February 17, 2017 email to Oshima, in which he explained that he had been

under the impression that by providing a doctor's note, he could re-code his February 9, 2017

---

*Limauro v. Consolidated Edison Co. of N.Y., Inc.*, No. 20-cv-03558 (CM), 2021 WL 466952 (S.D.N.Y. Feb. 9, 2021), that interpretation does not consider a request for reasonable accommodation to qualify as a "protected activity" under the NYCHRL.

personal day as a normal working day.  (Suess Ex. 40.)  Nothing about that email makes it "readily apparent" that he was objecting to any employment practice that he reasonably believed violated the law – federal or state.   His comment to Oshima thus does not constitute a complaint, protest, or objection for purposes of a retaliation claim.

Defendant is thus entitled to summary judgment dismissing Counts V and VI, under both State and City law.

## B.  *Reasonable Accommodations*

Plaintiff claims that Defendant failed to provide him with reasonable accommodations on two occasions: (1) when creating and enforcing the January 2017 Agreement, and (2) on February 9, 2017.  Here too, Defendant's motion for summary judgment must be granted.

To establish a *prima facie* case on a reasonable accommodation claim under the NYSHRL and NYCHRL, a plaintiff must show that: (i) he was a person with a disability under the meaning of the relevant statute; (ii) the defendant had notice of his disability; (iii) with reasonable accommodations he could perform the essential functions of his job; and (iv) the defendant refused to make such accommodations.  *Nieblas-Love*, 165 F. Supp. 3d at 73.

Both State and City laws require employers to engage in an "interactive process with [the employee] in order to arrive at a reasonable accommodation."  *LeBlanc v. United Parcel Serv.*, No. 11-cv-6983, 2014 WL 1407706, at *18 (S.D.N.Y. Apr. 11, 2014); N.Y.C. Admin. Code § 8-102.  However, employers are under no obligation to provide the "particular accommodation [the employee] 'requests or prefers.'"  *Vinokur v. Sovereign Bank*, 701 F. Supp. 2d 276, 295 (S.D.N.Y. 2010).  Rather, the employer "need only provide *some* reasonable accommodation."  *Id.* (emphasis in original).  Where "the employer has already taken (or offered) measures to accommodate the disability, the employer is entitled to summary judgment if, on the undisputed record, the existing

accommodation is 'plainly reasonable.'" *Concepcion v. City of N.Y.*, No. 15 CIV. 2156 (AJP), 2016 WL 386099, at *16 (S.D.N.Y. Jan. 29, 2016), *aff'd*, 693 F. App'x 31 (2d Cir. 2017).

Here, Defendant is entitled to summary judgment because the undisputed facts show that Defendant acted reasonably and engaged in a good-faith interactive process with Plaintiff to accommodate his appointments with Dr. Artandi and during the February 9, 2017 snowstorm.

The accommodations offered by Defendant and memorialized in the January 2017 Agreement – allowing Plaintiff to leave the office for up to 1.5 hours twice per week during the middle half of the day – are plainly reasonable. Oshima and Haney met with Plaintiff to discuss his absences and his medical needs, and they drew up the specifics of the accommodations based on Plaintiff's estimate of the length and frequency of his appointments. (Amley Tr. I at 122:13-22, 127:12-20.) Defendant never prevented Plaintiff from attending any of his scheduled appointments, even when Plaintiff failed to advise his managers that he had scheduled one and would be leaving the office, as was required by the Agreement. (Chinn Decl. Exs. 45, 46, 47.) Plaintiff was not required to use vacation, sick leave or personal days to make the appointments, and was paid for the time that he missed. (Amley Tr. II 34:21-36:19.) That is the definition of a reasonable accommodation.

Plaintiff argues that the accommodation was inadequate for the same reasons that he claimed to have been denied a benefit under the FMLA – because the January 2017 Agreement did not allow him to leave the office during the workday for three, as opposed to two, appointments; and because it required Plaintiff to make his appointments in the late morning or afternoon. But there is nothing unreasonable about either of those conditions. As discussed *supra*, there is no evidence in the record that Plaintiff ever told Oshima, Haney, or anyone else at SMBC that the arrangement to which he agreed would prevent him from obtaining his prescribed

36

treatment – whether from Dr. Artandi or another doctor in the practice – and there is no evidence in the record suggesting that it did.   In fact, prior to entering into the Agreement, Plaintiff frequently scheduled appointments with Dr. Artandi in the mid-afternoon; and he had never scheduled more than two appointments per week during the working day.   (Amley Tr. I at 40:15-19, 57:19-58:18, 65:10-22; Amley Tr. II at 15:3-34:20; Chinn Decl. Exs. 29, 30, 31-44.)

There is similarly nothing unreasonable about how Defendant handled Plaintiff's request that he be allowed to work remotely on the day of the February 2017 snow storm. Plaintiff informed Oshima that he was not comfortable walking through the snow to commute to the office, and Oshima gave Plaintiff the option to stay at home, taking a paid personal day. Plaintiff took Oshima up on that offer.  Although Plaintiff contends that he would have preferred to work from home and enter a normal working day into his timesheet, "Employees are not entitled to hold out for the most beneficial accommodation, and the employer need not offer the accommodation that the employee prefers. Instead, when any reasonable accommodation is provided, the statutory inquiry ends."  *Waltzer v. Triumph Apparel Corp.*, 09 cv 288 (DLC), 2010 WL 565428, at *6 (S.D.N.Y. Feb. 18, 2010).   Oshima offered Plaintiff two options, neither of which resulted in Plaintiff's being disciplined or docked pay for his absence.  That accommodation for Plaintiff's purported disability is plainly reasonable. And having offered a reasonable accommodation to Plaintiff, Defendant was not required to do more.  *See Kelly v. Starwood Hotels & Resorts Worldwide, Inc.*, No. 15-CV-6309 (DLC), 2017 WL 1133433 (S.D.N.Y. Mar. 24, 2017).[7]

Defendant's motion for summary judgment dismissing Counts III and VI, to the extent Plaintiff's discrimination claims under the NYCHRL and NYSHRL are premised on the failure to offer reasonable accommodations, is granted.

---

[7] The parties do not discuss whether, under the NYSHRL, plantar fasciitis qualifies as a "disability." I will not, therefore, explore the issue.

### C. *Disability Discrimination*

#### 1. NYSHRL

Under the NYSHRL, "a plaintiff establishes a *prima facie* case of discrimination by showing that: (1) he was a member of a protected class; (2) he was competent to perform the job in question, or was performing the job duties satisfactorily; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances that give rise to an inference of discrimination." *Spiegel*, 604 F.3d at 80. Discrimination claims under the NYSHRL are analyzed using the burden-shifting scheme set forth in *McDonnell Douglas*. *Id.* If a plaintiff succeeds in establishing a *prima facie* case of discrimination, the burden shifts to the defendant, who must proffer some legitimate nondiscriminatory reason for the adverse action. *Id.* At that point, the defendant will be entitled to summary judgment unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination.

Defendant moves for summary judgment on two grounds: (1) it had no knowledge that Plaintiff had a disability, and (2) the circumstances under which Plaintiff was given a poor performance review, reduced bonus, or terminated give rise to an inference of discrimination. It prevails on the former.

"It is, of course, elemental that an employer could not have discriminated against a plaintiff because of [his] disability if it was unaware that the plaintiff was, in fact, disabled." *Cozzi v. Great Neck Union Free Sch. Dist.*, No. 05-CV-1389-ENV-WDW, 2009 WL 2602462, at \*14 (E.D.N.Y. Aug. 31, 2009). That is because if an employer were truly unaware that a disability existed, it would be impossible for its hiring decision to have been based, even in part, on the plaintiff's disability. *Raytheon Co. v. Hernandez*, 540 U.S. 44, 55 n.7 (2003).

Under the NYSHRL, a "disability" is defined as "a physical, mental, or medical impairment . . . which prevents the exercise of a normal bodily function or is demonstrable by

38

medically accepted clinical or laboratory diagnostic techniques or (b) record of such impairment or (c) a condition regarded by others as such an impairment." N.Y. Exec. L. § 292(21). Unlike under federal law, there is no requirement that the impairment "substantially limit a major life activity." *Burton v. Metropolitan Transp. Auth.*, 244 F. Supp. 2d 525, 258 (S.D.N.Y. 2003).

Here, although Plaintiff insists that SMBC had sufficient information to determine that he suffered from a "disability" covered by the NYSHRL, the undisputed record belies that contention.

Although Plaintiff testified that he could not recall precisely what he said to Oshima and Haney regarding his condition, it is undisputed that Plaintiff never told them that he had "plantar fasciitis." Instead, he testified only that he gave "a layperson's description of the medical issue," (Amley Tr. I at 159:16-160:18) – essentially, that his foot hurt, which bothered him when he walked, and that he needed to see the doctor about it. Plaintiff concedes that he never used a crutch, wheelchair, or other walking aid around SMBC's office. (Amley Decl. ¶ 41.) The only evidence in the record indicating that *anyone* knew that he was "impaired" in any way is his statement that several unidentified SMBC employees noticed him limping around the office. (*Id.*)

That is not enough to raise a genuine issue of material fact. "[A]n employer's knowledge of a plaintiff's symptoms does not establish, as a matter of law, that it knew the plaintiff was disabled" within the meaning of the NYSHRL. *Cozzi*, 2009 WL 2602462, at *14 (collecting cases). Simply knowing that Plaintiff was experiencing pain, or even that he needed medical leave to deal with that pain, is insufficient, without more, to alert Oshima and Haney to the fact that he suffered from a covered disability. *Id.*; *see also Vaigasi v. Solow Mgmt. Corp.*, No. 11-cv-5088 (RMB) (HBP), 2017 WL 945932, at *7 (S.D.N.Y. Feb. 16, 2017), *aff'd*, 750 F. App'x 37 (2d Cir. 2018). There is no evidence in the record establishing that Oshima and Haney ever knew that Plaintiff suffered from an impairment that "prevent[ed] the exercise of a normal bodily function;"

39

all that can be gleaned from the record is that Oshima and Haney knew that Plaintiff's foot hurt. That is not "knowledge" of a "disability;" it is merely knowledge of symptoms.

Because there is no triable issue as to whether Oshima and Haney had notice that Plaintiff suffered from a qualifying disability, no reasonable factfinder could conclude that said disability was all or part of the reason why the adverse employment actions alleged by Plaintiff occurred. Defendant is therefore entitled to summary judgment dismissing Count III.

### 2. NYCHRL

However, I have little choice but to deny Defendant's motion for summary judgment on Count IV: disability discrimination under the NYCHRL.

"[F]or many years, the NYCHRL was construed to be coextensive with its federal and state counterparts." *Velazco v. Columbus Citizens Found.,* 778 F.3d 409, 410 (2d Cir.2015) (per curiam). But in 2005, the New York City Council amended the law to emphasize that "interpretations of state and federal civil rights statutes can serve only as a floor below which the [NYCHRL] cannot fall" and that the NYCHRL should "be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.,* 715 F.3d 102, 109 (2d Cir.2013) (quoting Local Civil Rights Restoration Act of 2005, § 7, N.Y.C. Local L. No. 85). In light of these revisions, courts must construe the NYCHRL's provisions "broadly in favor of discrimination plaintiffs to the extent that such a construction is reasonably possible." *Id.* (quoting *Albunio v. City of New York*, 16 N.Y.3d 472, 477–78, 922 N.Y.S.2d 244, 947 N.E.2d 135 (2011) (internal citations omitted)).

New York courts (and federal courts applying New York law) seeking to heed the City Council's command have adopted a framework similar, but not identical, to the one used under state and federal law. First, "the plaintiff must establish a prima facie case, and the defendant then

40

has the opportunity to offer legitimate reasons for its actions." *Ya-Chen v. City Univ. of N.Y.*, 805 F.3d 59, 75-76 (2d Cir. 2015) (citing *Bennett v. Health Mgmt. Sys.,* 936 N.Y.S.2d 112, 124 (1st Dep't 2011)). The elements of a *prima facie* case under the NYCHRL are the same as the elements under the NYSHRL. "If the defendant satisfies that burden, summary judgment is appropriate if no reasonable jury could conclude either that the defendant's reasons were pretextual, or that the defendant's stated reasons were not its sole basis for taking action, and that its conduct was based at least in part on discrimination. *Id.* (cleaned up). In other words, summary judgment is warranted if the defendant "can establish as a matter of law that its employment decision was based strictly on non-discriminatory motives." *McDonnell v. Schindler Elevator Corp.*, No. 12-CV-4614 VEC, 2014 WL 3512772, at *16 (S.D.N.Y. July 16, 2014), *aff'd*, 618 F. App'x 697 (2d Cir. 2015). "[I]n the discrimination context, this inquiry closely mirrors the questions that courts must answer when resolving summary judgment motions on Title VII [or NYSHRL] claims." *Ya-Chen Chen*, 805 F.3d at 76 n.13.

Again, Defendant moves for summary judgment on grounds that it did not have knowledge that Plaintiff suffered from a disability covered by the NYCHRL. This time, Defendant's argument fails. The NYCHRL defines "disability" as "any physical, medical, mental or psychological impairment, or a history or record of such impairment." N.Y.C. Admin. Code § 8-102(16). A physical impairment is defined, in turn, as "an impairment of any system of the body, including . . . the musculoskeletal system." (*Id.*) This definition is far broader than the one contained in the NYSHRL. The evidence in the record – namely, Plaintiff's testimony that he gave Oshima and Haney an "layperson's description of the medical issue" – raises a triable issue of fact as to whether Oshima and Haney had notice that Plaintiff suffered a condition that "impaired" his ability to walk without pain.

Defendant next moves for summary judgment on grounds that Plaintiff raises no genuine issue of material fact as to either the third or the fourth elements of a *prima facie* case: adverse activity or an inference of discrimination.

As to the third element: while the Court agrees with Defendant that neither the denial of Plaintiff's February 2017 request to work remotely during a snowstorm nor the imposition of "new conditions" of employment constitutes an adverse employment action (see supra., Part III.B.1), Plaintiff also alleges that his negative FY 2016 performance review and lower bonus and the termination of his employment all qualify as adverse employment actions. They do.

And so we turn to the fourth element: that the adverse employment action occurred under circumstances giving rise to an inference of discrimination.

Insofar as Plaintiff's FY2016 performance review and reduced bonus are concerned, there is not a scintilla of evidence in the record that Plaintiff's plantar fasciitis was used to justify either employment action.

But insofar as Plaintiff claims that he was terminated because he was "disabled" with plantar fasciitis: Plaintiff testified multiple times during his deposition that Oshima mentioned his "absences, including for medical visits," during the Final Warning and termination meetings. (Amley Tr. I at 158:12-159:1; Amley Tr. II at 103:2-104:14, 154:7-24, 290:13-23.) That testimony – which Oshima, of course, denies – is (barely) sufficient to raise an inference of discrimination.

Of course, that inference can and has been rebutted. As discussed in detail above, Defendant identified perfectly legitimate reasons for firing Plaintiff, including his poor reputation among coworkers and clients, performance issues, and his numerous unexcused absences in 2016 for reasons that had nothing whatever to do with his medical condition, but that related to his legal disputes against his ex-wife and apartment building.

And so we come to the third and final stage of the burden shifting analysis. The presumption of discrimination drops out, and the plaintiff has the burden to establish by a preponderance of the evidence that the employer's stated reason was merely a pretext for discrimination. *Spiegel*, 604 F.3d at 80. Nonetheless, summary judgment is appropriate only if the employer's nondiscriminatory reason is dispositive and forecloses any issue of material fact. *McDonnell*, 2014 WL 3512772, at *16. So the question is whether the deposition testimony cited above raises a genuine issue of fact on the question of pretext. It does.

Defendant argues that the probative value of Plaintiff's testimony is low, based on a plethora of contemporaneous evidence suggesting that his medical condition was not an issue, either at the time of the Final Warning or the termination. The text of the Final Warning contains no mention of Plaintiff's absences or medical condition; Oshima's script for the termination meeting (SMBC005603) does not mention the issue; Oshima swears that he did not deviate from the script during the meeting (a common practice when firing an employee); and Oshima's contemporaneous email to Plaintiff, Haney, and Judge summarizing what happened does not mention the issue.

The probative value of Amley's self-serving and uncorroborated testimony is very low indeed. But there is a clash between Plaintiff's version of what was said at the meeting and Oshima's version of events. And while the Court agrees that substantial evidence in the record supports Defendant's proffered nondiscriminatory reasons for Plaintiff's termination, "…at this stage in the proceedings, Plaintiff benefit[s] from the drawing of every conceivable inference in [his] favor." *See Wellner v. Montefiore Med. Ctr.*, No. 17 Civ. 3479 (KPF), 2019 WL 4081898, at *10 (S.D.N.Y. Aug. 29, 2019) (internal citation and quotation omitted). And at this stage, "the plaintiff is not required to show that the employer's proffered reasons were false or played no role

43

in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors." *Id.*

Were a jury to credit Plaintiff's testimony about what was said at the meeting, it could conclude that Plaintiff's medical absences played some role in the decision to terminate his employment. Accordingly, there exists a genuine dispute as to whether Plaintiff's inadequate performance at work was the only and actual reason for his termination. *See Wellner*, 2019 WL 7081898, at *9. That precludes this Court from granting Defendant summary judgment on Plaintiff's NYCHRL claim.

Defendant argues that even if Plaintiff has raised a genuine issue of material fact on this score, this Court should not consider that claim, because Plaintiff did not plead disability discrimination in his complaint; he pleaded only the failure to provide a reasonable accommodation, of which there is absolutely no evidence whatever.

Defendant is correct that parties may not assert new claims for the first time in submissions at the summary judgment stage. *See Peyton Holdings, LLC v. Clover Aviation Co.*, No. 18 Civ. 3165 (PAC), 2020 WL 4273981, at *5 (S.D.N.Y. July 24, 2020). But Defendant is wrong about the contents of the complaint; it does assert a claim for disability discrimination under the NYSHRL and NYCHRL. In his complaint, Plaintiff alleged that "during the warning and termination meetings, Oshima stated that Plaintiff's workplace absences, which he and SMBC were fully aware were caused by the need for medical treatment, were factors in Defendant's disciplinary decisions." (Compl. (Dkt. 1) ¶ 66.) Plaintiff alleged further that "Defendant terminated Plaintiff because of his disability . . . [and] because he required medical leave due to his serious medical condition." (*Id.* ¶¶ 67, 68). And the complaint included a cause of action for

disability discrimination under both the NYSHRL and NYCHRL. Defendant was thus on notice of Plaintiff's claim that he was discriminated against on the basis of his disability.

Defendant's motion for summary judgment on Count IV, disability discrimination under the NYCHRL, is denied. This claim under the City Human Rights Law is the only issue that remains for trial.

**V.    The Motion for Leave To File Under Seal is GRANTED**

Amley's motion for leave to file certain documents under seal was granted long ago. However, the court sees no reason to seal any portion of this opinion, and it will be filed on ECF without any sealing or redaction.

**CONCLUSION**

Defendant's motion for summary judgment is granted with respect to Counts I, II, III, V, and VI. Those counts are dismissed with prejudice. Defendant's motion for summary judgment on Count IV is denied.

This constitutes a written opinion.

The Clerk of Court is directed to close the motions at Dkts. 73, 80 and 82.

Dated: September 27, 2021

_____

U.S.D.J.


BY ECF TO ALL COUNSEL

45